UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


DAVID DEVEE,

            Plaintiff,

       v.

COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,

            Defendant.

Case No. 3:13-cv-00268-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, David Devee ("Devee"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 USC §§ 401-33. This court has jurisdiction under 42 USC § 405(g) and § 1383(c)(3). For the following reasons, the Commissioner's decision should be reversed and remanded.

## ADMINISTRATIVE HISTORY

Devee previously applied for DIB and SSI on August 25, 2006, alleging an onset date of October 1, 2005. Tr. 18. After his applications were denied both initially and on reconsideration, Devee requested a hearing before an Administrative Law Judge ("ALJ"). After

holding a hearing, ALJ Riley J. Atkins denied his applications on June 23, 2009, which Devee appealed. Tr. 18, 81-93. The Appeals Council affirmed ALJ Atkins's decision on July 16, 2009, and Devee did not appeal to the federal district court. Tr. 18, 94-96. ALJ Atkins's decision remains in effect as the final agency decision regarding the issue of Devee's disability through June 23, 2009. Tr. 18, 40.

Devee protectively filed an application for SSI on October 22, 2009, alleging a disability onset date of October 1, 2005. [1] Tr. 156-60. After his application was denied both initially and on reconsideration, Devee requested a hearing. Tr. 97-114. On June 30, 2011, ALJ Eleanor Laws held a hearing at which Devee and a Vocational Expert ("VE") testified. Tr. 37-77. At the hearing, Devee amended his alleged onset date to June 24, 2009. Tr. 18, 40. On July 26, 2011, ALJ Laws issued a decision finding Devee not disabled within the meaning of the Act. Tr. 18-31. On August 8, 2011, Devee requested review by the Appeals Council and submitted additional evidence containing his medical records from Kaiser Permanente from January 11 to May 31, 2010. Tr. 5, 12-14, 494-605. On December 19, 2012, the Appeals Council denied Devee's request for review, making ALJ Laws's opinion the final decision of the Commissioner. Tr. 1-15; 20 CFR §416.1481.

## BACKGROUND

Devee was age 32 at the time of his amended alleged onset date and age 34 at the time of his second hearing. Tr. 43. He attended but did not complete high school, has a GED, and has taken two months of college courses. Tr. 48, 195-96. Devee also attended vocational rehabilitation for a year and a half. Tr. 54. He has past relevant work as a bouncer, gas station attendant, fast food worker, warehouse worker, cook, and a server. Tr. 29, 66-67, 189. He

---

[1] The record also includes an Application Summary for DIB, completed the same day as the Application Summary for SSI. Tr. 149-59. However, there is no record that the Social Security Administration made a determination as to DIB.

alleges that he stopped working in 2004 due to severe pain in his back and legs and is disabled

based on a lumbar spine impairment, depression and arthritis.  Tr. 187-88.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to

determine whether a claimant is disabled within the meaning of the Act.  20 CFR § 416.920;

*Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

If so, the claimant is not disabled.  20 CFR § 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable

physical or mental impairment" that meets the 12-month durational requirement.  20 CFR

§§ 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.

*Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an

impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404,

Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a

listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other

relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The

claimant's RFC is an assessment of work-related activities the claimant may still perform on a

regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

At step one, the ALJ found that Devee has not engaged in substantial gainful activity since the application date, October 22, 2009.  Tr. 20.  At step two, the ALJ determined that Devee suffered from the severe impairments of degenerative disc disease of the spine, a leg length discrepancy causing SI (sacroiliac) joint dysfunction, obstructive sleep apnea, and a depressive disorder.  *Id*.  At step three, the ALJ found that Devee's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment.  Tr. 21.

The ALJ concluded that Devee had the RFC to perform light work, meaning he could: "engage in all postural activities occasionally (climbing, balancing, stooping, kneeling, crouching and crawling)," but should "avoid moderate exposure to hazards such as heavy moving machinery and unprotected heights."  Tr. 22.  Due to limitations from his short-term memory loss, he "can follow very short and simple instructions, and he can perform simply

routine tasks." *Id.*  He also must have "no more than minimal interaction with coworkers or the public, with work tasks being independent of others (no need to do team work)" and a "routine and predictable setting at work."  Tr. 22-23.

At step four, the ALJ found that Devee was unable to perform any past relevant work as a fast food worker, bouncer, cook, gas station attendant, or server.  Tr. 29.  However, at step five, the ALJ found that Devee was not disabled because he could perform other light, unskilled jobs as a cafeteria attendant and a laundry folder.  Tr. 30.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  The court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  However, the reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## FACTUAL AND MEDICAL BACKGROUND

Although the ALJ considered the entire medical record, the relevant period under consideration is from June 24, 2009, the amended alleged onset date, to the date of the decision, July 26, 2011.  Tr. 24.

The medical records before the amended onset date shows that Devee's back pain began at the age of 18 after a motor vehicle accident and worsened in 2004. Tr. 84,[2] 275, 278, 280. On May 18, 2005, magnetic resonance imaging ("MRI") revealed mild degenerative changes at the L2-3 and L4-5 without stenosis in the lumbosacral spine and a normal cervical spine. Tr. 84. On October 5, 2007, follow-up imaging of the brain and spine, with specific focus on the sacroiliac joints, was normal. *Id*. On October 19, 2007, Devee sought chiropractic treatment for severe neck pain and with associated headaches and severe low back pain. Tr. 275. Follow-up x-rays showed mild L5-S1 degenerative joint disease and the left femur head 20 mm lower than the right. Tr. 276. Devee was prescribed daily chiropractic treatments for one week. Tr. 277.

On November 2, 2009, Devee began treatment with Daniel S. Tamashiro, M.D., for chronic lumbar back pain. Tr. 309-12. Devee was not in acute distress and "[p]alpation of []his back was unremarkable," although the "area of pain is in the upper lumbar spine around L2-L3." Tr. 311. There was "palpable deformity or obvious scoliosis" but no "CVA tenderness." *Id*. Dr. Tamashiro concluded that the pain was possibly caused by ankylosing spondylitis or degenerative arthritis. *Id*. X-rays of the thoracic and lumbosacral spine taken that same day showed very minimal left convex scoliosis of the lower thoracic spine, and the "underlying bony structures of the lumbosacral spine [were] intact." Tr. 339-40. An MRI taken on November 8, 2009, showed "some degenerative change of the facet joints at L4-5 and L5-S1," but "no evidence of focal disk protrusion or extrusion and no evidence of spinal stenosis or compression of the nerve roots." Tr. 338. An X-ray taken on January 4, 2010, of the sacroiliac joints appeared unremarkable. Tr. 336.

---

[2] The record does not contain medical records prior to November 22, 2005. *See* Tr. 243. Instead, the court cites the reference to such records in ALJ Atkins's decision. Tr. 81-93.

At his next appointment on November 17, 2009, Duvee reported to Dr. Tamashiro the same symptoms of "a lot of back aches, mostly in the left lumbar spine" and "a lot of myalgias too and weakness in his hands." Tr. 305. Although Devee claimed to have some lumbar issues in the past, Dr. Tamashiro noted that the "recent MRI did not demonstrate this." *Id.* He also reported that Devee's gait was normal and that all neurological tests were negative. Tr. 306. He diagnosed Devee with myalgia (muscle pain) and "[p]ossible fibromyalgia," noting: "He does not have the classic fibromyalgia pressure points. The only place that is tender is over the first cervical rib and possibly the upper thighs, but the occipital and trapezius areas were not tender. He was a little tender in the lumbar spine." *Id.* He referred Devee to physiatry for an opinion. *Id.*

On December 8, 2009, Devee complained of the same back pain that started "in his tailbone area, radiates up his lumbar spine into his thoracic spine." Tr. 300. Dr. Tamashiro reiterated that the MRI and labs were negative, but that he might suffer from fibromyalgia. Tr. 301. To treat the pain, Dr. Tamashiro prescribed an increase in Gabapentin from 900 mg to 1200 mg per day. *Id.*

Based on Dr. Tamashiro's referral, physiatrist Michael C. Hsu, M.D., examined Devee on December 14, 2009. Tr. 295-97. Devee told Dr. Hsu that he had suffered with constant lower back pain since he was age 24 and that maintaining employment after age 26 had become impossible. Tr. 295. Devee also reported taking pain medication daily since age 28 after a short trial of narcotics. *Id.* Upon examination, Devee exhibited pain behavior, but Dr. Hsu noted no sign of radiculopathy, psychomotor retardation, or loss of sensation, and the Babinksi and Slump test were negative. Tr. 296-97. Devee's standing active range of motion was moderately restricted in all three planes, and the standing stork test was positive on the left. *Id.* After re-

interpreting the November 8, 2009 MRI as "completely normal," he assessed Devee's condition

to be a biomechanical etiology stemming from a right greater than left "leg length discrepancy

causing a SI joint dysfunction, which over time forced his right pelvis into posterior rotation and

his left pelvis to compensate in anterior rotation."  Tr. 297.  He prescribed foods high in vitamin

K, daily home exercises, and two heel lifts for his left shoes.  Tr. 297-98.

On January 4, 2010, Devee returned to Dr. Tamashiro for his back pain, wondering if he

suffered from a sleep problem.  Tr. 288-91.  Devee also brought disability papers for

Dr. Tamashiro to fill out.  Tr. 289.  Dr. Tamashiro noted that Devee described his mobility as

"quite limited" because the pain occurred with "very minimal physical activity."  *Id.*  "He cannot

really stand or sit for long periods of time or stoop or carry heavy objects at all."  *Id.*  The

examination showed no change in Devee's condition with some tenderness still in the lumbar

spine, but no palpable abnormality.  *Id.*  As a result, his impression was:

> [c]hronic low back pain of unclear etiology.  There is no definite structural
> abnormality on recent scan so there is nothing surgical that can be done.
> The patient to follow up with physiatry for recommendations, but as of yet
> there is not clear diagnosis of what is causing his disability of back pain.
> In any case, I feel he is disabled and I do not think he can really work and
> I filled out his disability papers to reflect this.  He will continue the
> exercises given to him in physiatry and follow up with physiatry.

Tr. 290.

Because the Gabapentin was not helping with the pain, Dr. Tamashiro prescribed tapering

its use and referred Devee to a chronic pain management group.  *Id.*  However, Devee did not

respond to three attempts to schedule his appointments (January 5, February 18, and March 15,

2010).  Tr. 599-601.

On January 7, 2010, when admitted to the Emergency Department for ear pain, a

muscoskeletal examination found him "[n]egative for myalgias, neck pain and back pain" and

with normal range of motion.  Tr. 284.  The psychiatric exam was negative for depression, with

normal mood and affect, normal behavior, and no insomnia.  *Id.*

On January 14, 2010, at the request of Devee's attorney, Dr. Hsu filled out a Medical

Source Statement of Ability to Do Work-Related Activities (Physical).  Tr. 345-49.  He

described Devee as being able to lift and/or carry up to 10 pounds occasionally and fewer than

10 pounds frequently, stand and/or walk fewer than two hours a day, sit for fewer than six hours

a day, occasionally engage in postural activities, but determined he should never climb and must

avoid vibration.  *Id.*  Noting that the physical examination "is most consistent with [illegible] and

sensitization of lower lumbar facet points," he added that "definitive diagnostic testing is still

pending."  Tr. 347.

A month later on February 17, 2010, Neal E. Berner, M.D., based on a review of the files,

completed a Physical Residual Functional Capacity Assessment finding that Devee could lift

and/or carry up to 20 pounds occasionally and fewer than 10 pounds frequently, stand and/or

walk about six hours a day, sit for about six hours a day, and occasionally engage in postural

activities.  Tr. 368-75.  He concluded that Devee's statements were "partially credible" and noted

"conflicting observations."  Tr. 373.  He also gave only partial weight to Dr. Tamashiro's

opinion and cited ALJ Atkins's decision noting "clear instances of [Devee] exaggerating &

fabricating medical [history, treatment, symptoms] and functioning, & he believes there is no

medically documented [treatment] that corrobates [*sic*] his claims of back pain."  Tr. 374-75.

Also in February 2010, Joshua J. Boyd, Psy. D., reviewed Devee's file and assessed a

mental and affective/depressive disorder with psychotic features and features of anxiety.

Tr. 350-67.  He also assessed Devee with the mental RFC of "understanding and remembering

very short and simple instructions, not detailed instructions" and determined that he "[s]hould

not be in a work environment requiring frequent public or co-worker contact."  Tr. 366.

Based on a sleep study, Devee was diagnosed with obstructive sleep apena on March 12,

2010.  Tr. 518-29.  He was provided with a CPAP on April 16, 2010.  Tr. 533.

On July 15, 2010, Paul Rethinger, Ph.D., reviewed Devee's file and agreed with

Dr. Boyd's opinion.  Tr. 381.  Similarly on July 14, 2010, Dr. Linda L. Jensen, M.D., reviewed

the file and agreed with Dr. Berner's opinion.  Tr. 380.

Devee established care with Ashley Hart, M.D., in September 2010, to address his history

of depression and pain.  Tr. 470.  At the time he was taking Prozac and Prilosec.  Tr. 473.  Devee

told Dr. Hart that "he [had] been given numerous diagnoses over his life — depression, anxiety,

bipolar.  Has been on numerous medications.  Says he had daily thoughts of hurting himself.

Does not feel like life is in his own hands."  Tr. 472.  Although he was not suicidal, Devee

admitted if "death came to my door, I would go."  *Id.*  Devee's gait was normal; he had 2+

patellar and Achilles reflexes bilaterally; and his body movements were grossly intact and

symmetric.  Tr. 473.  His affect was open, unguarded and direct, with good eye contact, and no

psychomotor agitation or retardation.  *Id.*  Dr. Hart assessed Devee with dysthymic disorder (for

which she prescribed Prozac), obstructive sleep apnea, and chronic pain.  Tr. 474.  By that time,

Devee had been using a Continuous Positive Airway Pressure ("CPAP") machine for the prior

four months to treat his sleep apnea.  *Id.*

When Devee returned to Dr. Hart on October 18, 2010, after an emergency department

visit, he had "minimal" paraspinal tenderness most prominent in the lumbar region with no SI

tenderness.  Tr. 467.  His gait was normal with 2+ patellar and Achilles reflexes bilaterally and

negative straight leg raises on both legs.  *Id.*  Dr. Hart posited that Devee "may well have

fibromyalgia" and diagnosed him with lumbar back pain "most consistent with muscular in origin." *Id.*

On December 30, 2010, Devee was examined by Bruce Marks, F.N.P.  Tr. 463-65.  The musculoskeletal exam showed "mildly limited flexion (poor flexibility)," but negative straight leg raises, and perfect plantar and dorsiflexion muscle strength.  Tr. 463.  He encouraged Devee to lose weight, modify his diet, and engage in gentle home exercises.  *Id.*

Devee was again examined and evaluated by Dr. Hart on April 21, May 9, and May 31, 2011, shortly before his disability hearing.  Tr. 449-59.  On April 21, she noted that 11 out of 18 points were positive for fibromyalgia and that the sham points of thumbs and the left forearm were also positive.  Tr. 457.  Devee exhibited signs of fatigue and was tearful, although his thought content was linear and persistent.  *Id.*  His back and neck pain had progressively worsened since the last appointment, although he admitted to trying exercises and stretches at home to relieve pain.  Tr. 456.  Dr. Hart assessed him with myalgia and myositis unspecific and noted that fibromyalgia was a "very probable diagnosis," but planned to "get lab tests to eval[uate] for other causes."  Tr. 458.

Her last notes in the record repeat her opinion of unspecified myalgia and myositis. Tr. 453. [3]  On May 9, Dr. Hart recommended increasing his prescription Nortriptylene for the pain, and by May 31, he was taking four tablets at night.  Tr. 449.  Although Dr. Hart still had not diagnosed fibromyalgia, she made a note to "[r]un medcheck for fibromyalgia meds <u>duloxetine</u> and <u>milnacipran</u>" and to research whether the fibromyalgia clinic accepted "care [O]regon."  Tr. 450.

///

---

[3] Devee asked Dr. Hart to complete disability paperwork on his behalf.  Tr. 452.  As ALJ Laws noted at the hearing, this paperwork is not in the record.  Tr. 63.

## FINDINGS

Devee argues that the ALJ erred by:  (1) improperly evaluating the opinion of his treating physician, Dr. Tamashiro; (2) failing to give clear and convincing reasons for rejecting his testimony; (3) improperly discounting the testimony of his roommate, Debbie Miller ("Miller"); and (4) improperly defining his RFC.

## I.    **Treating Physician**

Devee's primary argument is that the ALJ failed to give proper weight to the opinion of his treating physician, Dr. Tamashiro, who opined on January 4, 2010, that Devee suffered from "[c]hronic low back pain of unclear etiology, " is "disabled," cannot work, and "is going to have to deal with this probably for the rest of his life."  Tr. 290.  The ALJ gave "no weight" to this opinion "because it is inconsistent with the record as a whole" and "contradicted by the medical record."  Tr. 26.

In order to reject the uncontroverted opinion of a treating or examining doctor, the ALJ must present clear and convincing reasons for doing so.  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005), citing *Lester v. Chater*, 81 F3d 821, 830-31 (9th Cir 1995).  However, if a treating or examining doctor's opinion is contradicted by another doctor's opinion, it may be rejected for specific and legitimate reasons.  *Id.*  Likewise, "[a]lthough the ALJ is not bound by an expert medical opinion on the ultimate question of disability, she must provide 'specific and legitimate' reasons for rejecting the opinion of a treating physician."  *Tommasetti v. Astrue*, 533 F3d 1035, 1041 (9th Cir 2008) (citation omitted).  The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician.  *Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990).

Incongruity between a treating provider's opinion as to disability and her medical records provides a specific and legitimate reason for rejecting that opinion about the claimant's limitations. *Tommasetti*, 533 F3d at 1041. As support for finding Dr. Tamashiro's opinion inconsistent with the medical record, the ALJ cited Dr. Tamashiro's notes as admitting "there is no objective evidence to explain [Devee's] allegations of disabling pain." Tr. 26. This characterization is inaccurate. Dr. Tamashiro noted only a lack of a definitive diagnosis, not the absence of any evidence indicating the source of Devee's back pain. Tr. 289. In fact, the medical record shows that Devee started complaining of back pain in 2004. Tr. 278, 280, 295. MRIs in 2005, 2007, and 2009 revealed mild degenerative changes in the lumbar spine. Tr. 84, 276, 338. Accordingly, the ALJ found that Devee suffered from the severe impairment of degenerative disc disease at step two and acknowledged that it is "likely to cause some limitations." Tr. 24.

More importantly, both Dr. Tamashiro and Dr. Hart opined that Devee probably suffered from fibromyalgia which would reasonably be expected to produce disabling pain. As the ALJ correctly noted, Devee had not been diagnosed with fibromyalgia at the time of the hearing. Tr. 21. However, according to Dr. Hart's examination, he met at least some of the criteria to support that diagnosis. *See* SSR 12-2P, 2012 WL 310486 (July 25, 2012); *Benecke v. Barnhart*, 379 F3d 587, 590, 594 (9th Cir 2004) (holding that an ALJ errs in requiring objective evidence for a disease such as fibromyalgia that "is diagnosed entirely on the basis of patients' reports of pain and other symptoms" and "that eludes such measurement"). In fact, her fibromyalgia assessment corroborated the symptoms Devee had presented over a year earlier to Dr. Tamashiro. Despite their bafflement over its precise cause, no medical provider rejected an objective basis for Devee's pain. Even ALJ Laws acknowledged that absent a definitive

diagnosis, Devee has "symptoms [his] provider suspects may be attributed to fibromyalgia, including diffuse myalgias, myositis, fatigue, and troubles with concentration and memory" and purported to accommodate those symptoms in the RFC.  Tr. 21.  The issue is whether she did so.

The ALJ also rejected Dr. Tamashiro's opinion because it was contradicted by the medical record.  However, as support, she cited only one example when, a few[4] days after his visit with Dr. Tamashiro, Devee was admitted to the emergency department for ear pain.  Tr. 26.  As the ALJ correctly noted, Devee's "musculoskeletal examination was entirely normal and he denied any back or neck pain."  *Id.*  Since Devee was seeking emergency medical treatment for ear pain, this one notation is very weak evidence of a contradiction, especially when compared to the weight of the other medical records evidencing Devee's numerous attempts to obtain relief for his back pain and a diagnosis.

Although not specifically given as a reason to reject Dr. Tamashiro's opinion, ALJ Laws concluded that the medical records "support a conclusion that [Devee] has some exertional, postural, and nonexertional limitations, however, no limitations that can preclude all work whatsoever."  Tr. 26.  According to numerous musculoskeletal examinations, Devee was only moderately restricted in his motion.  Tr. 284, 296, 463, 473.  However, the disabling effect of pain cannot be confirmed by objective medical evidence alone, but necessarily depends on Devee's subjective complaints.  Devee's testimony about his level of constant pain which increases upon exertion would, if believed, rule out any level of work.  Thus, to what extent Devee's pain limits his ability to work full-time rests on his credibility, as discussed next.

By rejecting the opinions of Devee's treating physicians and instead crediting the opinions only of the non-examining physicians, the ALJ erred.

---

[4] Although the ALJ says this was six days later, the citation is to a medical record dated January 7, 2010, only three days later.  Tr. 26, citing Tr. 283-84.

## II.    Devee's Credibility

The ALJ found Devee "only partially credible" regarding his statements about the severity of his back pain and physical impairments limiting his ability to function in a work setting. Tr. 28. Devee argues that the ALJ erred by failing to adequately credit his complaints of disabling pain.

### A.    Legal Standards

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*). A general assertion that the plaintiff is not credible is insufficient; the ALJ "must state which [subjective symptom] testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993). The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence and other evidence." 20 CFR § 404.1529(a). Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter*, 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996). This standard "is the most demanding required in Social Security cases." *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F3d 920, 924 (9th Cir 2002).

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid. *Tommasetti*, 533 F3d at 1040.  Inconsistencies in a claimant's testimony, including those between the medical evidence and the alleged symptoms, can serve as a clear and convincing reason for discrediting such testimony.  *Burch v. Barnhart*, 400 F3d 676, 680 (9th Cir 2005); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 599 (9th Cir 1999).  Failure to seek medical treatment is also a clear and convincing reason to reject a claimant's subjective statements.  *Burch*, 400 F3d at 681; *Fair v. Bowen*, 885 F2d 597, 603-04 (9th Cir 1989); *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996).

Credibility determinations are within the province of the ALJ.  *Fair*, 885 F2d at 604, citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988).  Where the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, the role of the reviewing court is not to second-guess that decision.  *Id.*

**B.**    **Testimony**

Devee testified that his biggest barriers to regular employment were back and muscle pain, sleeplessness, fatigue, headaches, anxiety, short-term memory loss, lack of concentration, as well as digestive and bowel issues.  Tr. 55.  He described his pain in his back as constant and eight on a scale of zero to ten, with "ten being you're going to the emergency room."  Tr. 55-56.

He can sit in a general office chair for "60 minutes-ish" before having to stand up or lay down and can only stand for 20 minutes before having to sit down.  Tr. 56.  He can walk two to three city blocks before having to rest.  *Id.*  Lifting always involves pain, but he can lift 20-25

pounds two or three times without aggravating the pain.  Tr. 56-57.  As a result, he estimated that

he would only be able to lift less than five pounds for two and a half hours out of an eight-hour

day.  Tr. 57.

Devee's daily pain relief routine consists of 30 minutes of exercising and stretching, as

well as prescription medication.  *Id.*  His exercises consist of pushups, sit-ups, martial arts style

stretching, knee bends, leg lifts, and a pelvic exercise to strengthen his core muscles.  *Id.*

Afterwards, his pain is elevated to a nine, "if not a 9.5," and he feels "drained, tired, [and] worn

out."  Tr. 57-58.  As a result, he takes one to two naps a day "two to three hours-ish."  Tr. 58.

Although he uses a CPAP machine, he only sleeps two to four hours a night.  *Id.*  He has

struggled with insomnia for six to seven years.  Tr. 59.

Devee's struggle with depression leaves him feeling:

> Lack of motivation, feeling guilty, thinking about that I'd be better off
> dead.  Crying, low self-worth, low self-esteem.  Low appetite, decreased
> energy. . . . it's not that I want to kill myself, or that I am having any plans
> to harm myself, it's just that the pain and the depression has gotten so
> much to deal with for so long that I just — I can't deal with it and I just
> want it to be over. . . .  And I'm not going to do anything to do it, but I
> welcome it, if it happens."

Tr. 59-60.

He experiences these symptoms daily and cries up to three times a week.  Tr. 60.

He also suffers from symptoms of anxiety once or twice a week, including "[s]weating,

shallow breathing, tight chest, rapid heartbeat.  I feel like someone is watching me, I feel

like something really bad just happened, but I have no idea what."  *Id.*  Sometimes his

anxiety manifests in panic attacks lasting one to two hours.

17 – FINDINGS AND RECOMMENDATION

Devee has trouble with memory and concentration.  For example, he forgets appointment dates and times, whether he ate a meal earlier in the day, when he last took his medication, and who he talked to over the phone four hours earlier.  Tr. 61.

Devee cohabitates with a roommate who "does most of the household stuff."  *Id.* However, he contributes by taking the trash out once a week and vacuuming the living room carpet which "doesn't take very long."  Tr. 62.  He also cooks for himself, but "mostly . . . whatever I can throw in the microwave."  *Id.*  These activities increase his level of pain.  *Id.*

Finally, when asked if he could do even a simple routine, sit-down type of job, he responded, "I'd be falling asleep on the job, I know I would.  I've done it."  *Id.*

C.    **Analysis**

Because ALJ Laws found no affirmative evidence of malingering, she was required to give clear and convincing reasons to reject Devee's subjective pain testimony.  She cited minimal or negative objective findings, conservative treatment, a poor work record, marijuana use, and contradictory reports and testimony.  Tr. 28-29.  These purported reasons for discrediting Devee fall short of the clear and convincing standard.

First, the ALJ found that Devee's testimony about pain and limited functioning contradicted the objective medical findings that consistently reported no abnormalities in his spine.  Tr. 28.  An ALJ may not discredit the claimant's testimony as to the degree of his subjective pain symptoms on the sole ground that it is not fully supported by objective evidence. *Lester*, 81 F3d at 834.  Nonetheless, "the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."  *Rollins v. Massanari*, 261 F3d 853, 857 (9th Cir 2001), citing 20 CFR § 404.1529(c)(2).  "If a claimant submits

objective medical findings of an impairment that would normally produce a given symptom, but testifies that he experiences the symptom to a greater degree than would normally be expected, the Secretary may disbelieve that but must make specific findings justifying his decision." *Swenson v. Sullivan*, 876 F2d 683, 687 (9th Cir 1989) (citation omitted). As explained above, despite the minimal objective findings, Devee's testimony as to his subjective pain is consistent with the reports and conclusions by both of the treating physicians, Drs. Tamashiro and Hart, that he suffers muscle pain, probably due to fibromyalgia.

Second, the ALJ cited Devee's "periodic and conservative treatment" with no "prescribed narcotic pain medications on a regular basis," no prescribed "TENS unit," and no "recommended surgery" for his back pain. Tr. 28. Although true, the ALJ ignores evidence in the record that Devee tried many prescription non-narcotic medicines to control his pain without success. *E.g.*, Tr. 456, 510. Moreover, the record does not reflect that more aggressive treatment options were appropriate or available. No medical provider recommended surgery due to the difficulty in determining the source of the pain. Tr. 290 ("There is no definite structural abnormality on recent scan so there is nothing surgical that can be done."). Instead, Devee followed medical advice to engage in exercise. Tr. 297-98, 449, 463. A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist.

Third, the ALJ interpreted Devee's poor work history as demonstrating "a lack of motivation to work, and not due to symptoms of his impairments." Tr. 29. Evidence of a claimant's poor work history and lack of propensity to work negatively affects his credibility regarding his inability to work. *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002). Before he stopped working, Devee's prior earnings showed that he earned no more than $4,000.00 per year. Tr. 174-82. However, it is far from clear that this information alone suggests a lack of

motivation to work.  If anything, Devee's many jobs until 2006 reflect a desire to work. Although ALJ Laws did not inquire as to why all of his jobs ended, Devee testified that he quit one job in 1999 because he it was too physical and quit another job in 2003 after four months due to pain.  Tr. 14, 50, 52-53.  Even if this adverse credibility finding potentially approaches the clear and convincing standard, it is not a sufficient basis, standing alone, to question Devee's testimony regarding the extent of his pain.

Fourth, citing Devee's past use of marijuana, the ALJ concluded that it "likely prevents him from passing potential employers' drug tests.  This suggests that, in today's competitive job market, a primary obstacle to employment may be his marijuana use and inability to pass a drug test."  Tr. 29.  When asked by the ALJ, Devee testified that he did not have a medical marijuana card, had not used marijuana regularly in the past, and last used marijuana four months ago. Tr. 64.  The record contains no other reference to marijuana other than Dr. Hart noting that Devee expressed interest in treating his pain and mood with medical marijuana card.[5]  Tr. 449, 452.  Thus, the ALJ's conclusion about Devee's marijuana use preventing his employment is nothing more than unsupported and inappropriate speculation.

Fifth, the ALJ stated that Devee's "reports and testimony are highly contradictory." Tr. 29.  "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  SSR 96-7P, 1996 WL 374186, at *5.  As an example, the ALJ cited Devee's report dated January 11, 2010, that he can lift five to 10 pounds, stand for 30 minutes, and walk half a block (Tr. 215) as contradicting his later testimony that he can lift 20-25 pounds and does push-ups for exercise when weighing 250 pounds.  Tr. 29.  Claiming an ability to lift greater weight at the hearing does not indicate

---

[5] Although ALJ Atkins referenced Devee's marijuana use in 2005 (Tr. 85), ALJ Laws did not.

any attempt by Devee to magnify his symptoms, but the opposite.  At best, this change in testimony is minimal, not "highly" contradictory as characterized by the ALJ.

Moreover, an ability to do push-ups is not evidence of any contradiction.  Home exercises were part of Devee's treatment for his back symptoms.  Tr. 297, 463.  Absent any description of the types of push-ups done, Devee's ability to do push-ups may not indicate that he is stronger than he lets on because he may modify the exercise to accommodate symptoms of his degenerative disc disease.  Furthermore, he explained that the exercises elevate his pain.  Tr. 57-58.

As another example of a contradiction, the ALJ stated that despite his allegation of a "poor appetite due to his depression, however, the record shows he is obese and the record does not demonstrate any significant weight loss."  Tr. 29.  Devee's obesity is not necessarily inconsistent with his testimony about his reduced appetite.  There are several explanations for not losing weight during the years he suffered from digestion and bowel problems.  For instance, the caloric value of his food may prevent him from losing weight.  Devee's testimony that his meals consist of microwavable food supports his contention.  *See* Tr. 62.  Furthermore, "the failure to follow treatment for obesity tells us little or nothing about a claimant's credibility." *Orn v. Astrue*, 495 F3d 625, 638 (9th Cir 2007).

This case is notable for what is lacking.  It is devoid of evidence that Devee's subjective allegations regarding his pain are inconsistent with his daily activities.  To the contrary, his daily activities appear to be fully consistent with his subjective complaints of pain and fatigue.  Although purporting to accept the symptoms attributable to potential fibromyalgia, the ALJ failed to address any of Devee's possible fibromyalgia-related limitations in assessing his credibility.  It also lacks evidence of a propensity by Devee to exaggerate his symptoms.  To the

21 – FINDINGS AND RECOMMENDATION

contrary, Devee repeatedly sought and complied with medical recommendations. He took all prescribed medications and treated his pain with exercise even though it caused him increased pain. He did not attend the chronic pain management group recommended by Dr. Tamashiro, but the record does not indicate the reason.

Nevertheless, Devee's credibility may be suspect. In 2009, ALJ Atkins accused him of "exaggerating and fabricating medical history, treatment, symptoms and functioning." Tr. 88. ALJ Laws did not make a similar finding or even a finding of malingering. Instead, she simply rejected his subjective pain testimony based on reasons that are not clear and convincing. Given ALJ Atkins's decision, such clear and convincing reasons may well exist.

## III.    Lay Testimony

The ALJ considered, but accorded "little weight" to, Miller's written testimony because "multiple statements are inconsistent with the record and the claimant's own reports." Tr. 28. Devee contends that this was error.

### A.    Miller's Testimony

At the time of her written statement dated January 4, 2010 (Tr. 198-205), Miller had known Devee for four years and was spending on average 10 hours per day with him. Tr. 198, 202. She described his daily routine as an hour of watching TV in the morning, followed by a two hour nap, after which he would get up for an hour or two before taking a second nap. *Id.* Despite his multiple naps, Devee had difficulty falling and remaining asleep and felt tired when awake. Tr. 199. She usually had to remind Devee to bathe and take his medicine. Tr. 199-200 ("Being he is in so much pain all the time, I honestly don't think he thinks about his personal hygiene, so I feel I need to remind him."). She explained that she usually cooks meals for him,

and that Devee was unable to do any household chores.  *Id.*  She described his attention span as "nil."  Tr. 202.

According to Miller, Devee left the apartment two to three times a week.  On some occasions, she took him for a drive (because he did not have a driver's license) or made him sit outside.  Tr. 201.  Devee did shop for food at the grocery store once a month for a couple of hours.  *Id.*  When leaving the apartment, Devee used a back brace and cane, although not prescribed.  Tr. 204.

Miller reported that "in the last couple of years, I have noticed a big difference in him as to not being able to walk for more than 10-15 minutes as it used to be about 20-30 min[utes]."  Tr. 202.  She has also noticed that "he has been more irritable [and] less sociable within the last year [and] a half."  *Id.*

By the time of her second written statement dated July 1, 2011 (Tr. 241-42), Devee had been living in Miller's apartment for six years.  Tr. 241.  Miler admitted that when they first met she "had some doubt about the validity of his claims about the unending pain and depression" because she "had seen many shows about people making similar claims only to find out they are con-men."  *Id.*  However, she "really sympathized with [Devee] and could see it was genuine."  *Id.*

By mid-2011, Devee and Miller were spending less time together (six to eight hours per day) because she worked a day shift full-time.  *Id.*  She noticed that he had trouble with his bowels and digestion.  *Id.*  Other physical limitations included an inability to "stand for more than about 20-30 minutes continuously" or "walk for longer than about 3-4 blocks continuously."  *Id.*  Also, when he tried to lift heavy furniture in an effort to help Miller rearrange, he could only lift for "a few seconds at a time, and afterwards would seem to almost collapse from pain."  *Id.*

Devee's expressions of sadness, frustration, annoyance, irritability, and depression were still apparent. Tr. 242. Miller witnessed him sitting in the dark and crying three to four times per week. *Id.* She also provided specific examples that she observed of Devee's short attention span and memory loss. *Id.*

**B.**    **Legal Standards**

To reject lay witness testimony, the ALJ "must give reasons that are germane to each witness." *Molina v. Astrue*, 674 F3d 1104, 1114 (9th Cir 2012), citing *Dodrill*, 12 F3d at 919. Under Ninth Circuit law, the ALJ may not "discredit . . . lay testimony as not supported by medical evidence in the record." *Bruce v. Astrue*, 557 F3d 1113, 1116 (9th Cir 2009), citing *Smolen*, 80 F3d at 1289 ("The rejection of the testimony of [the claimant's] family members because [the claimant's] medical records did not corroborate her fatigue and pain violates SSR 88-13, which directs the ALJ to consider the testimony of lay witnesses where the claimant's alleged symptoms are *unsupported* by her medical records." (alteration in original)).

**C.**    **Analysis**

As an example of an inconsistency with Devee's testimony, the ALJ noted that Miller "reported [Devee] does not prepare his own meals and he does no household chores," as opposed to Devee's testimony "that he cooks simple meals, he vacuums, and he takes out the garbage." Tr. 28. This is not a material inconsistency. It is entirely plausible that Miller may not have noticed that Devee emptied the garbage once a week, vacuumed a single room in the apartment, or made microwavable meals for himself when she was working and not at home. There is no evidence how frequently Devee did these tasks.

Even if this is a legitimate discrepancy, it does not justify disregarding Miller's testimony in its entirety. She was in a position to observe him for many hours a day over many years, and

her observations of his daily activities and physical and mental symptoms are entirely consistent

with Devee's subjective complaints.  Thus, the ALJ erred by rejecting Miller's testimony.

Because Miller's statements bolstered Devee's claims of pain and fatigue, that error was not

harmless.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F3d 1050, 1056 (9th Cir 2006).

IV.    **RFC**

Devee also argues that the ALJ improperly characterized his RFC, but without

designating the specific error.

An RFC is defined as "an assessment of an individual's ability to do sustained work-

related physical and mental activities in a work setting on a regular and continuing basis,"

meaning "8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8P, 1996

WL 374181, at *1.  "The RFC assessment considers only functional limitations and restrictions

that result from an individual's medically determinable impairment or combination of

impairments, including the impact of any related symptoms."  *Id.*

At the hearing, the ALJ posed to the VE a hypothetical for a light semi-skilled work.

Recognizing that treatment providers and examiners had characterized Devee to suffer from

other DSM-IV diagnoses, such as bipolar disorder and PTSD, and troubles with concentration

and memory, the ALJ added a restriction of no "more than minimal interactions with the

coworkers or the public."  Tr. 68.  However, the RFC did not accommodate the other symptoms

of fibromyalgia, despite inconclusive evidence to support a diagnosis.  Tr. 21.  For example, it

did not include symptoms that Dr. Hart believed would be associated with fibromyalgia, such as

diffuse myalgias, myositis and fatigue.  *Id.*

///

///

V.    **Remedy**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138-39 (9th Cir 2011), quoting *Benecke*, 379 F3d at 593. The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell*, 947 F2d at 348. The reviewing court declines to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by failing to provide legally sufficient reasons for rejecting the opinion of Dr. Tamashiro and discrediting the testimony of Devee and Miller. As a general rule, that evidence should be credited as true. *See Harman*, 211 F3d at 1179; *Smolen*, 80

F3d at 1281-83; *Varney v. Sec'y of Health and Human Servs.*, 859 F2d 1396, 1398 (9th Cir

1988).  However, "[w]here it is not clear that the ALJ would be required to award benefits were

the improperly rejected evidence credited, the court has discretion whether to credit the

evidence."  *Connett*, 340 F3d at 876.  "A claimant is not entitled to benefits under the statute

unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be."

*Strauss*, 635 F3d at 1138.  The appropriate weight given the opinion of Dr. Tamashiro and the

testimony of Devee and Miller depends on whether that testimony is corroborated by the

objective results of additional fibromyalgia testing.  Until the record is completed in that regard,

it is not sufficiently clear whether Devee is entitled to immediate benefits.  Outstanding issues

must be resolved before a determination of disability can be made.

This case is complicated by the probability that Devee suffers from fibromyalgia, but

lacks a firm diagnosis.  As noted, both Drs. Tamashiro and Hart seemed on the verge of that

diagnosis at the time of the hearing.  Yet the ALJ issued a decision within a month after the

hearing without contacting either physician to obtain clarification.  "In Social Security cases the

ALJ has a special duty to fully and fairly develop the record."  *Smolen*, 80 F3d at 1288 (citation

omitted).  "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow

for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate

inquiry.'"  *Tonapetyan v. Halter*, 242 F3d 1144, 1150 (9th Cir 2001), quoting *Smolen*, 80 F3d at

1288 (additional citation omitted).  "The ALJ may discharge this duty in several ways, including:

subpoenaing the claimant's physicians, submitting questions to the claimant's physicians,

continuing the hearing, or keeping the record open after the hearing to allow supplementation of

the record."  *Id* (citations omitted).  Both triggering conditions are present in this case.  The

mounting evidence of a fibromyalgia creates an ambiguity regarding the source of Devee's back

pain, and the ALJ noted that the lack of definitive diagnosis made it impossible to assess the severity of the suspected impairment.

A diagnosis of fibromyalgia would also shed light on the veracity of Devee's testimony. If Devee is diagnosed with fibromyalgia, then his testimony should be credited as true.  At the same time, the strong wording of the earlier decision by ALJ Atkins raises questions as to Devee's credibility.  Also, this court is troubled by Devee not pursuing one treatment that might alleviate his pain, namely joining a chronic pain management group.  However, the ALJ did not clearly tie Devee's credibility to his unexplained failure to schedule an appointment to attend the prescribed group classes.

The reviewing court's remand order may include "detailed instructions concerning the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed." *Sullivan v. Hudson*, 490 US 877, 885 (1989) (citation omitted).  On remand, the ALJ should complete the record associated with Devee's suspected fibromyalgia and reevaluate Dr. Tamashiro's opinion, as well as Miller and Devee's testimony, in light of any supplemental records.  Whether or not such records exist, the ALJ should reformulate the RFC to include the muscle pain (likely of fibromyalgia) observed by Dr. Hart.

## RECOMMENDATION

For the reasons stated above, the Commissioner's decision should be reversed and remanded for further administrative proceedings.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Monday, August 04, 2014.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED  July 16, 2014.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge